William E. BROCK, III, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

LOCAL 630 Of the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.

No. CV 85–3944 DT(Kx).

United States District Court, C.D. California.

June 5, 1987.

Robert C. Bonner, Frederick M. Brosio, George H. Wu, Los Angeles, Cal., for plaintiff.

James M.H. Ball, Los Angeles, Cal., for defendant.

## OPINION

TEVRIZIAN, District Judge.

This action presents several issues related to the interplay between the provisions of an international union's constitution governing candidacy for union office and a federal statute regulating union elections. Plaintiff, William E. Brock, III, Secretary of Labor, United States Department of Labor ("Secretary"), commenced this action on June 14, 1985, under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (Act of September 14, 1959, 73 Stat. 519 *et seq.*, 29 U.S.C. 401 *et seq.*) ("Title IV" or "LMRDA" or "the Act"). The Court has jurisdiction pursuant to 29 U.S.C. Section 482(b).

## BACKGROUND

The stipulated facts of this case can be briefly summarized. Defendant, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, Local 630 ("the Local"), is a local labor organization headquartered in Los Angeles, California.[1] The Local is, and at all

times relevant to this action has been, chartered by the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America ("the International"), an international labor organization. Both the Local and the International are engaged in an industry effecting commerce within the meaning of 29 U.S.C. Sections 402(e), 402(j), and 481(b).

The Local, purporting to act pursuant to the International's Constitution and the Local's By-Laws, conducted a mail-ballot election of officers in late 1984. The election involved, among other issues, the selection of three individuals to serve as Trustees of the Local, each for a three-year term of office beginning January 1, 1985. The election was subject to the provisions of the Act regulating union elections.

On October 24, 1984, the Local published a Notice of Nomination for the election in "Southern California Teamster," a union periodical. This notice stated that nominations of candidates would be received at a regularly scheduled general membership meeting of the Local on November 4, 1984. The notice further stated that each member of the Local in good standing with the union for twenty-four months prior to nomination would be eligible to be nominated, provided the member also met the requirements of Article II, Section 4(a)(1) of the International's Constitution. Section 4(a)(1) provides, in relevant part, that any candidate for office of a Teamster local must be "actively employed at the craft ... for a period of twenty-four (24) consecutive months prior to the month of nomination for said office."[2]

At the November 4, 1984, general membership meeting, the following six individu-

---

1. Local 630 is the surviving entity of a merger of Local 630 and Local 595 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. These locals merged on or about August 1, 1986. Prior to the merger, Local 630 had approximately 6,000 members and Local 595 had approximately 8,000 members. Only Local 595 members were eligible for nomination in the election at issue in this action, and only Local 595 members were eligible to vote in this election. For purposes of this opinion, the Court shall refer to defendant as either "Local 630" or "the Local."

2. Article II, Section 4(a)(1) of the Constitution states in relevant part:

   "To be eligible for election to any office in a Local Union, a member must be in continuous good standing in the Local Union in which he is a member and in which he is seeking office, and actively employed at the craft within the jurisdiction of such Local Union, for a period of twenty-four (24) consecutive months prior to the month of nomination for said office, and must be eligible to hold the office if elected."

als were nominated for election to the three Local Trustee positions: Duncan Anderson, Michael Buckley, Vernon Smith, George Blunt, Wilson Overall, and Betty Velasquez. At the time of their nomination, Anderson, Buckley, and Smith were incumbents to the office of Local Trustee.

The parties agree that Anderson, Smith, Blunt, Overall, and Valesquez were actively employed at the craft for two years prior to nomination, i.e., since November, 1982. They further agree that Buckley's active employment during this period was interrupted by an eight-month jail term commencing in November, 1983, for a drunken driving conviction.[3] Before Buckley began serving his sentence, however, the Executive Board of the Local ("Board" or "Local Executive Board") granted him a leave of absence for the period of his incarceration pursuant to Article II, Section 4(a)(4) of the International's Constitution.[4]

Following balloting by mail which ended December 10, 1984, Velasquez, Anderson, and Buckley were elected.[5] On or about December 9, 1984, one of the unsuccessful candidates, Vernon Smith, filed a protest of the election results with Teamsters Joint Council 42 ("Joint Council"), a regional union organization with which the Local is affiliated.[6] The protest specifically charged that Buckley was ineligible for reelection because he had not been actively employed at the craft for a period of twenty-four consecutive months prior to the date of his nomination as required by Article II, Section 4(a)(1) of the International's constitution.

On January 21, 1985, a panel of the Joint Council's Executive Committee held a hearing on this protest. The panel thereafter recommended that the protest be denied, and the Executive Committee formally adopted this recommendation. Smith then

| Candidate | Vote |
|---|---|
| Velasquez | 1153 |
| Anderson | 960 |
| Buckley | 927 |
| Smith | 830 |
| Blunt | 770 |
| Overall | 647 |

3. At the beginning of the two-year period preceding the nomination meeting and continuing without interruption until April 5, 1983, Buckley was employed at the craft by a single employer, A.M. Lewis. From June 23, 1983, to November 4, 1983, Buckley was continuously employed at the craft by another single employer, Joseph E. Seagrams Company. In October, 1983, Buckley was convicted of drunken driving and as a result served a jail term from November, 1983, to July, 1984. Upon his release from jail, Buckley was again employed at the craft by Seagrams.

4. Article II, Section 4(a)(4) of the Constitution states:

"The requirement of continuous good standing and working in the jurisdiction and the obligation to take a transfer card or an honorable withdrawal card, as provided in this Constitution, shall not be applicable to any officer or employee during a leave of absence granted to such officer or employee with the approval of the Local Union Executive Board."

On November 8, 1983, the Local Executive Board of Local 630 approved a leave of absence for Buckley from November 7, 1983, to May 7, 1984. On July 13, 1984, the Board extended this leave of absence to cover the period from May 8, 1984, to July 9, 1984. In both instances, the Executive Board's actions were published in the Board's minutes which were read at the following general membership meeting and made available to the membership.

5. The results of the election, as certified by the American Arbitration Association, were as follows for the three Local Trustee positions being filled in this election:

6. Section 16(g) of Local 630's By-Laws requires that any protest or charge by any Local member concerning the conduct of an election, after the election has been held, must be made to the Joint Council by the Local member in writing by registered or certified mail within seventy-two hours after the final tally of the ballot. The protest or charge must set forth the exact nature and specification of the protest or charge and the member's claim as to how the matter complained of has affected the outcome of the election.

Any such protest or charge must be considered and ruled upon by the Executive Board of the Joint Council. Adverse decisions of the Executive Board are then appealable to the General Executive Board of the International. At no time before or after the election did Smith make any complaints, either verbal or in writing, directly to the Local concerning the allegations contained in the plaintiff's complaint. The parties agree' that the alleged violation of Title IV complained of in this action was subject to a timely internal protest pursued as required by 29 U.S.C. Section 482(a)(1) of the Act by a complaining member in good standing of the Local.

appealed the Committee's decision to the General President of the International. When Smith failed to receive a final decision on his protest within three months, he filed a complaint with the Secretary of Labor in accordance with 29 U.S.C. Section 482(a)(2). The Secretary investigated Smith's complaint pursuant to its authority under Section 521 and subsequently filed the present action on June 14, 1985.

## ISSUE PRESENTED

Section 4(a)(4) of the International's constitution states in relevant part: "The requirement of continuous good standing ... shall not be applicable to any *officer or employee* during a leave of absence granted to such *officer or employee* with the approval of the Local Union Executive Board." (emphasis added.) The issue presented here is whether Section 4(a)(4) is valid, both on its face and as applied to this election, in light of Section 401(e) of Title IV which requires in part that "every member in good standing [with the union] shall be eligible to be a candidate and hold office (subject to reasonable qualifications uniformly imposed)...."

## DISCUSSION

Whether a particular provision of a union's constitution is reasonable and capable of uniform application in accordance with Section 481(e) depends on its consistency with the purposes of the Act. *Steelworkers v. Usery*, 429 U.S. 305, 309, 97 S.Ct. 611, 614, 50 L.Ed.2d 502 (1977); *Donovan v. Sailors' Union of the Pacific*, 739 F.2d 1426, 1429 (9th Cir.), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985). The Act's principal goal is to "prevent undemocratic practices in union government, including dictatorial and corrupt leadership and a disregard for the rights of the rank and file." *Id.; Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 497, 88 S.Ct. 1743, 1746, 20 L.Ed.2d 763 (1968). Moreover, one specific purpose of the Act is to prevent restrictive union election practices which might unfairly perpetuate entrenched union leadership. *Id.*, 391 U.S. at 499, 88 S.Ct. at 1748. Accord-

ingly, qualifications for union election which "unduly interfere with a free choice of candidates are at cross-purposes with the Act and therefore are unreasonable." *Sailors' Union*, 739 F.2d at 1429; *Donovan v. Local No. 120, Laborers' Int'l Union of North America*, 683 F.2d 1095, 1102, (7th Cir.1982).

The Local argues that Article II, Section 4(a)(4) is a valid provision of the International's Constitution and that Buckley became eligible for reelection as a Local Trustee under the authority of this provision by virtue of the Local Executive Board's approval of his leave of absence. In response, the Secretary challenges the validity of Section 4(a)(4) on two grounds. First, the Secretary contends that Section 4(a)(4) discriminates on its face against rank-and-file members of the Local by granting the Local Executive Board express authority to waive the working-at-the-craft requirement for officers and employees seeking union office in the Local, but denying the same privilege to the rank-and-file membership. Second, plaintiff argues that Section 4(a)(4) fails to provide reasonable and uniformly imposed guidelines for determining when a local union may waive the working-at-the-craft requirement for any given individual.

### A. Does Section 4(a)(4) Discriminate Against the Rank-and-File?

■ The Secretary first contends that Section 4(a)(4) is discriminatory both on its face and when read in the context of the surrounding language in the Constitution. Union election regulations which treat union members differently in the nomination and election process must be held to a high level of scrutiny. *Sailor's Union, supra*, 739 F.2d at 1429 ("restrictions on candidate eligibility should be closely scrutinized"). Although not fatal to an election scheme, such provisions violate Section 481(e) if they unduly interfere with the free choice of union candidates, or otherwise encourage undemocratic practices in union government. *Id.* Moreover, when the election rules favor incumbent union officers over rank-and-file members, the dis-

parate treatment is particularly worrisome. As the Second Circuit has observed:

"Inherent in any organization are factors that impede the exercise of free choice and contribute to the ability of those in power to maintain control.... Unlike candidates in a two-party system, those challenging incumbent union leaders are often viewed as disloyal to the union. In addition, control over the union's bureaucracy enjoyed by union leaders gives them an opportunity to perpetuate themselves through the dispensation of patronage. Moreover, power over the channels of communication, while subject to restrictions, is another means of maintaining power. The tight grasp of incumbent leaders should be recognized when a court interprets LMRDA union election requirements so that opposition voices can be heard and their weight felt."

*Donovan v. CSEA Local Union 1000*, 761 F.2d 870, 875 (2nd Cir.1985) (citations omitted).

By its terms, Section 4(a)(4) allows Teamster locals to waive the working-at-the-craft requirement for union officials and employees, but fails to extend a similar privilege to the balance of the union membership. In this respect the provision treats Teamster members differently by creating two classes of union membership: officers and union employees who may avail themselves of the working-at-the-craft waiver and rank-and-file members who may not. Such a distinction, of course, is discriminatory on its face.

A comparison of the language in Section 4(a)(4) with the language in the other sub-sections of this provision further underscores this discriminatory policy. Sections 4(a)(1) through 4(a)(3) establish mandatory qualifications which nominees for union office must meet in order to become eligible to stand for election.[7] In each of these sub-sections the International employs the term "members" to describe those individuals who must comply with these qualifications. In striking contrast to the use of the term "members" in each of these three sub-sections, however, Section 4(a)(4) only allows an "officer or employee" to receive a waiver of the working-at-the-craft requirement. If the International had intended to include all members in Section 4(a)(4), logic and the basic rules of statutory construction suggest it would have again used the word "members." *See* 2A Sands, *Sutherland on Statutory Construction*, Section 45.12 (4th ed. 1984) at 54 (it is a well established principle of statutory interpretation that the law favors rational and sensible construction). Instead, the abrupt change in language reinforces the conclusion that the provision in question is not applicable to the membership as a whole, but only to a select few within the union— i.e., officers and employees.

The Local contends that notwithstanding the clear language of Section 4(a)(4), it has consistently interpreted the term "officer and employee" to include all members of the Local. To support its position, the Local points to the uncontroverted fact that since October 1, 1982, its Executive Board has granted leaves of absence to at least ten union members who were neither officers nor employees of the union. This ar-

---

7. *See* note 2 *supra* for the language contained in Article II, Section 4(a)(1). Article II, Section 4(a)(2) states as follows:

"A Local Union in its Bylaws may require that a *member*, to be eligible for election to any office in the Local Union, must have attended a minimum number of the regular or divisional meetings of the Local Union, but not to exceed fifty percent (50%) during the twenty-four (24) consecutive months prior to nomination. Any Local Union in which a meeting attendance requirement is in effect shall keep accurate records reflecting those *members* who are in attendance at each meeting and shall enact, after proper notice to its *mem-*

*bers*, either a bylaw amendment or an appropriate motion exempting from the attendance requirement any *member* who, because of illness, regular employment, or other good cause, is unable to attend a meeting. Any exemption system shall be uniformly and fairly applied." (emphasis added.)

Similarly, Article II, Section 4(a)(3) provides: "To be eligible for election to any office of the International Union, or a subordinate body other than a Local Union, a *member* must be in compliance with Article II, Section 4(a)(1) and 4(a)(2), if applicable, prior to nomination for said office." (emphasis added.)

gument, however, is not persuasive for several reasons.

First, nothing in the record indicates that these ten union members received a waiver from the working-at-the-craft requirement in order to run for union office. The significance of Section 4(a)(4) is that is exempts officers and employees from the requirement *for the purpose of running for union office.* Thus, while waivers may be granted to rank-and-file members for a variety of other reasons without offense, they may not be granted—and apparently were not granted by the Local—to members in order to qualify them for nomination to union office.

Second, the Local has no authority to expand the definition of an "officer and employee" to include rank-and-file members. Indeed, Article XXII, Section 1 of the International Constitution expressly provides that any by-laws adopted by a local union must comply, and not conflict, with the Constitution.[8] Consequently, if the Local had given waivers to rank-and-file members in order to allow them to qualify for union office, these waivers would have violated the Constitution.

Finally, assuming the Local did exercise complete discretion to grant waivers to any of its members, Section 4(a)(1) of the International's Constitution, which requires that a member standing for union election be "actively employed at the craft," would quickly lose all meaning. Under defendant's interpretation, it could grant waivers to any member for any reason, thus making the International's working-at-the-craft requirement a dead-letter rule in practice. Nothing in the record suggests that the International intended to extend to its local unions such broad discretion.

■ For the above reasons, the Court concludes that Section 4(a)(4) of the International's Constitution is discriminatory both on its face and when considered within the context of the other relevant language within the document itself.

### B. *Does Section 4(a)(4) Provide Reasonable and Uniformly Imposed Guidelines for the Election of Officers?*

■ The Secretary also contends that Section 4(a)(4) violates the requirements of Section 481(e) because it fails to establish reasonable and uniformly imposed guidelines under which waivers to the working-at-the-craft requirement may be granted. Section 542.53 of the Secretary's regulations interpreting Section 481(e) states in relevant part:

"An essential element of reasonableness is adequate advance notice to the membership of the precise terms of the requirement.... *Qualifications must be specific and objective.* They must contain specific standards of eligibility by which any member can determine in advance whether or not he is qualified to be a candidate.... Further, [a subjective] requirement is by its nature not capable of being uniformly imposed as required by Section 401(e)"

29 C.F.R. Section 452.53 (1981) (emphasis added).[9]

No where does Section 4(a)(4) establish "specific and objective" standards a Teamster local must employ when deciding whether or not to grant a waiver of the working-at-the-craft requirement.[10] With-

---

8. Article XXII, Section 1 provides in relevant part:

"Section 1. Each Local Union shall adopt its own separate Bylaws which must comply, and may not conflict, with the provisions of the International Constitution."

9. Although the Secretary's interpretative guidelines are not binding on this Court, they are entitled to consideration. *Sailor's Union, supra,* 739 F.2d at 1429; *Usery v. Local Div. 1205, Amalgamated Transit Union,* 545 F.2d 1300, 1304 (1st Cir.1976).

10. In this regard it is particularly instructive to compare Section 4(a)(4) with Section 4(a)(2) of Article II. Section 4(a)(2) requires any Teamster local that intends to institute an "attendance requirement" for nominees to union office to adopt specific written standards for exempting a member from this qualification if the member can demonstrate "good cause" for failing to meet the requirement. Good cause must be defined to include "illness" and "regular employment". In addition, this sub-section allows a waiver if the member can show "other good cause" for his or her inability to meet the meeting attendance requirement, and further re-

out such guidelines, the implementation of this provision becomes a matter of subjective—and perhaps arbitrary—decision-making by the local union. For example, a local Executive Committee could grant a waiver to one union member who failed to meet the working-at-the-craft requirement (e.g., due to his or her incarceration for a criminal conviction), and thus allow that person to run for union office, but deny a waiver to another member under the same circumstances and effectively block that individual's opportunity to seek union office. Through this unbridled discretion, an entrenched union leadership bent on retaining power could potentially thwart its rivals. Indeed, such discretion creates exactly the potential for abuse the Act was enacted to prevent. *Sailor's Union, supra*, 739 F.2d at 1429.[11]

■ The Court recognizes, of course, that under certain circumstances waiving the working-at-the-craft requirement can actually further the goals of Section 481(e) by expanding "free and democratic" union elections. *Wirtz, supra*, 391 U.S. at 498–99, 88 S.Ct. at 1747–48. Indeed, a working-at-the-craft requirement *must* be subjected to some exceptions or other limitations in order to ensure that it does not become unreasonable as applied in actual practice. For example, strict enforcement of Section 4(a)(1) would prevent full-time union officers from seeking reelection to union office. Similarly, an inflexible application of

this provision would preclude full-time or part-time union employees engaged in organizing activity from seeking union office. Such restrictions would improperly penalize individuals who perform valuable services for the benefit of the union.

The Secretary's regulations acknowledge this need for flexibility in the application of the working-at-the-craft requirement:

"It would ordinarily be reasonable for a union to require candidates [for union office] to be employed at the trade ... for a reasonable period. In applying such a rule an unemployed member is considered to be working at the trade if he is actively seeking such employment. *Such a requirement should not be so inflexible as to disqualify those members who are familiar with the trade but who because of illness, economic conditions, or other good reasons are temporarily not working.*

29 C.F.R. Section 452.41(a) (emphasis added.) Certainly, serving as a union officer or employee constitutes a "good reason" for not being actively employed in the craft for a certain period of time, and would therefore represent a reasonable basis for granting a waiver.[12]

The problem with Section 4(a)(4), however, is that it does not define the "other good reasons" for which the working-at-the-craft requirement may be waived. And again, without such guidelines, local union

---

quires that "[a]ny exemption system shall be uniformly and fairly applied." *See* note 7, *supra.*

In contrast, as discussed above, Section 4(a)(4) does *not* require the Local to establish or meet *any* guidelines for excusing officers and employees from the working-at-the-craft requirement. Therefore, Local Executive Boards have total discretion when deciding whether or not to exempt an "officer or employee" from certain nomination qualifications, but are subject to a more restrictive "good cause" standard with deciding whether or not to exempt a "member" from other nomination requirements. The record does not reveal the reason for this distinction.

11. The Secretary does not allege, and this Court does not imply, that officials of Local 630 were engaged during this election in conduct designed to thwart their rivals or otherwise abuse the powers and privileges of their offices.

Nevertheless, the Court must examine the validity of Section 4(a)(4) in terms of its overall consistency with Section 401(e) of the Act. If Section 4(a)(4) does not pass legal muster, the waiver granted to Buckley pursuant to this provision is invalid regardless of the actions taken by the Local's leadership.

12. Here, the Executive Board did not grant Buckley a waiver for his work as a union official, but rather to protect his eligibility for reelection in the face of his incarceration for a criminal conviction. In the Court's view, criminal incarceration does not constitute a "good reason" for waiving the working-at-the-craft requirement. Beyond this finding, however, the Court does not have occasion here to consider the range of "good reasons" which may exist for granting a waiver to the working-at-the-craft requirement, and therefore makes no judgment on this broader issue.

officials have the opportunity to use their subjective decision-making authority to unfairly thwart rivals and thereby perpetuate their own administration. *Wirtz, supra,* 391 U.S. at 499, 88 S.Ct. at 1748.

In short, to be "reasonable and uniformly imposed" for purposes of Section 481(e), Section 4(a)(4) of the International Constitution needs "clear and specific" guidelines which define the circumstances under which union locals may grant or deny waivers to the working-at-the-craft requirement. Because such reasonable guidelines do not exist, the Court finds that Section 4(a)(4) violates Section 481(e).[13]

## CONCLUSION AND ORDER

In sum, the Court finds that Section 4(a)(4) of the International's Constitution violates 29 U.S.C. Section 481(e) in two respects. First, it discriminates on its face against rank-and-file members of the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America by creating a special privilege for officers and employees of the union who desire to become candidates for union office. Insofar as this special privilege impacts upon eligibility to be a candidate for union office, the privilege must be subject to close scrutiny to determine whether Section 4(a)(4) meets the requirements of Title IV that regulations of union elections be "reasonable" and "uniformly imposed." Here, this discriminatory provision was used to qualify Michael Buckley as a candidate for Local Trustee. Accordingly, the Court finds that Section 4(a)(4), as written and applied in the election at issue here, does violate Section 481(e).

Second, the Court finds that Section 4(a)(4) does not include specific and objective guidelines defining the circumstances under which Teamster locals may grant or deny waivers to the International's working-at-the-craft requirement. Without these guidelines, the potential for abuse by union leaders, while not present in this case, makes this provision unacceptable under the standards of Section 481(e). Accordingly, because Michael Buckley was nominated for the position of Local Trustee under a waiver granted by the Executive Committee of Teamster Local 630 pursuant to Section 4(a)(4), and was subsequently elected following balloting ending December 10, 1984, the Court concludes that Mr. Buckley's election was invalid and cannot stand.

For the above reasons, the Court, by Order dated November 10, 1986, has ORDERED and ADJUDGED as follows:

1. Defendant's election for the office of third Trustee, completed on December 10, 1984, is null and void pursuant to Section 402 of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. Section 482.

2. Defendant shall conduct an election (inclusive of new nominations) for its office of third Trustee for a term of office ending December 31, 1987, under the supervision of the plaintiff and in accordance with Title IV of the Act and (insofar as lawful and practicable) in accordance with the By-Laws of the defendant and the Constitution of the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, herein after called the International.

---

**13.** Defendant further argues that the Secretary, through this action, is acting to narrow rather than broaden the opportunity to become a candidate for union office by reducing the Executive Board's discretionary authority to grant waivers of the working-at-the-craft requirement. Therefore, according to the Local, plaintiff's action here actually contravenes the purpose of Title IV, which was enacted to broaden the opportunities for participation in the union electoral process. This argument is without merit. It is the International Constitution's working-at-the-craft requirement itself—not the Secretary's reg-

ulations or actions—which places the basic road block in front of potential candidates for union office. By requiring union members to be actively employed at the craft for twenty-four consecutive months prior to nomination, the International has expressly decided to restrict the number of eligible candidates for local union office. The only role for the Secretary, and indeed for this Court, is to insure that this self-imposed union requirement is both "reasonable" and capable being "uniformly imposed" as required by Section 481(e). This the Secretary has done by instituting the present action.

3. All decisions as to interpretation or application of Title IV of the Act and the Bylaws of the defendant and the Constitution of the International, relating to said election, shall be made by the plaintiff; and such decisions shall be final and binding, unless and until set aside by this Court as arbitrary and capricious.

4. The defendant shall complete said election on or before February 14, 1987.[14]

5. The plaintiff shall report to this Court the results of his supervision, including reporting whether said election was conducted in accordance with Title IV of the Act, and (insofar as lawful and practicable) in accordance with the provisions of the By-Laws of the defendant and the Constitution the International, and if so, certifying the name of the person so elected. Upon approval of such certification, the Court shall enter a judgment declaring that such person has been duly elected as shown by such certification.

6. This Court shall retain jurisdiction to declare the name of the person duly elected.

7. The defendant shall pay such court costs as may be taxed herein.

---

**14.** Defendant argues that the next regularly-scheduled election of officers is slated to begin in less than a year from the decision of this Court and thus, in light of the cost of conducting a new election under the supervision of the Secretary, the equities of this case require that no election should be held until the next regularly-scheduled election. The problem with this argument is that a new election under the supervision of the Secretary is the remedy Congress expressly provided for in Title IV. *See* 29 U.S.C. Section 482(c).